Charles R. **BALLAS**, Plaintiff,

v.

LeRoy E. **SYMM**, Defendant.

Civ. A. No. 72–H–1377.

United States District Court,
S. D. Texas,
Houston Division.

Nov. 13, 1972.

Michael Anthony Maness, of Maley & Friedman, Houston, Tex., for plaintiff.

Will Sears and David F. Beale, of Sears & Burns, Houston, Tex., for defendant.

## SUPPLEMENTAL AND AMENDED MEMORANDUM AND ORDER

NOEL, District Judge.

On October 12, 1972, plaintiff Charles R. Ballas, a white male student whose parents reside in McKeesport, Pennsylvania, filed his complaint alleging violations of his constitutional and statutory civil rights by defendant LeRoy E. Symm, the Tax Assessor-Collector of Waller County, Texas. In particular, plaintiff Ballas individually complains of defendant Symm's practice of requiring students who seek to register as voters in Waller County to complete what he denominates as a Questionnaire Pertaining to Residence, referred to herein as questionnaire.

Defendant, in the performance of his statutory duties, utilizes these questionnaires as an aid in determining whether an applicant is a bona fide resident of Waller County. Plaintiff alleges that this practice, which is not required of non-students, is a constitutionally impermissible deprivation of his federal civil

rights in contravention of the Fourteenth Amendment, the Civil Rights Act of 1965, 42 U.S.C. § 1971, and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1988. Plaintiff also contends that he is undoubtedly a bona fide resident of Waller County, Texas, and should be registered to vote there.

In addition to his individual claim, plaintiff seeks to maintain his action as a class action, F.R.Civ.P. 23, on behalf of a class defined as "all persons who are qualified electors under the Constitution and laws of the State of Texas and who, being so qualified, made application to defendant for a voter registration certificate in accordance with the laws of the State of Texas but were denied such certificate because in determining their ineligibility for such a certificate, defendant (or other authorized public employees or officials acting at defendant's direction or instruction) applied to such persons any standard, practice or procedure different from the standards, practices or procedures applied under color of law to other individuals within Waller County, Texas who have been found by defendant to be qualified to vote in that county." (Plaintiff's Complaint, p. 2).

Plaintiff seeks injunctive and declaratory relief, in particular:

(1) an order declaring the case to be a proper class action [F.R.Civ.P. 23(c) (1) ];

(2) a declaratory judgment decreeing that defendant's acts have deprived plaintiffs of rights, privileges and immunities;

(3) a preliminary and permanent mandatory injunction directing defendant immediately to issue to each plaintiff a valid Texas voter registration certificate;

(4) an award of $1,000 in attorneys fees; and

(5) general relief, to wit, "such further relief as the Court may deem just and equitable under the circumstances."

At pretrial hearing held October 24, the Court heard testimony of plaintiff relative to his claim of residency in Waller County. At that time defendant interposed a motion to dismiss on several grounds. Defendant's motion was later reduced to writing, supported by brief, and has been carried with the case to this point.

On October 30, the Court held a hearing on plaintiff's request for a preliminary injunction. Plaintiff presented testimony from the defendant, Deputy Registrar of Waller County Eristus Sams, and the plaintiff. At hearing the Court suggested that the case was not properly a class action. The Court also suggested that since state court relief was appropriate and available to individual applicants denied registration, a federal court should abstain from decision. Finally, the Court expressed the view that the individual plaintiff, Ballas, presented an appealing claim to bona fide residency.

On November 3, testimony resumed with the defendant presenting his case. Mrs. Linda Wallingford, a deputy county clerk, the Honorable Jack Taylor, Waller County Judge, and defendant Symm testified for defendant. At the close of testimony, the Court announced it would render its decision in open court on Monday, November 6, 1972, 9:30 a. m.

1. *Procedures Regarding Movement of the Case*

In his pleadings and motions, and orally at each of the hearings, plaintiff through his attorney in charge, has expressed impatience and dissatisfaction with the movement of the case. The attorney is a young, inexperienced lawyer, not heretofore admitted to practice in this Court. The latter fact did not become known to the Court at or before the pretrial hearing of October 24, although under the requirements of Rule 1.E. of the Local Rules of this Court, the attorney should have obtained leave of the Court to appear before filing plaintiff's complaint. For the purposes of this case only, the attorney was admitted at the hearing on October 30.

Certain findings of the Court concerning certain procedural matters are contained in a separate writing prepared and filed on November 6, 1972. This was done in order to shorten the text of this Supplemental and Amended Memorandum and Order for publication. They are incorporated herein and made a part hereof, from which I turn to the dispositive aspects of the case.

## 2. *The Class Action*

An important procedural question is whether the case is properly a class action within the meaning of F.R.Civ.P. 23. Plaintiff focuses on the questionnaire used by defendant as an aid for determining residency and views its constitutionality as the dispositive issue, and thus urges the "questions of law or fact common to the class." F.R.Civ.P. 23(a)(2). Defendant views the issue as one of determining on an individual basis the residence of each applicant for registration and therefore as to each member of the class as such is defined by plaintiff. In that regard, defendant urges that the facts surrounding the residency of each applicant differ, which prevents the presence of common questions of fact requisite to maintenance of the case as a class action. Manard v. Miller, 53 F.R.D. 610 (E.D.Va.1971) aff'd 405 U.S. 982, 92 S.Ct. 1253, 31 L. Ed.2d 449 (1971).

■■ Two factors prevent the Court from considering this case an appropriate class action. First, because of the proximity of the election, the requested relief could not be granted to the entire class at this late date. The case is therefore moot as far as the entire class is concerned. Secondly, the constitutionality of the questionnaire and the supporting statute, Texas Election Code, Art. 5.08(k), V.A.T.S., the issues common to all class members, have already been decided by this Court in Wilson v. Symm, 341 F.Supp. 8 (S.D.Tex.1972). That decision is clearly res judicata to at least six members of the proposed class here.

## A. *Class Action Barred by Mootness*

The first ground upon which the Court must decline to entertain a class action in this case is mootness. Defendant strongly urges that plaintiff's claim is mooted because absentee voting began on October 18. Defendant claims that insufficient time remains to provide the relief requested for the plaintiff class.

Mootness is a very practical concept. Events may transpire resolving a dispute such that a judicial decision will not affect the position of the parties. Such cases present no justiciable controversy and must be dismissed. E. g., Munoz v. Amador, 340 F.2d 590 (5th Cir. 1965).

■ The test for mootness is whether the class can be given the substantial relief sought for it by plaintiff. If the requested relief for the class cannot be provided by a decision favorable to plaintiff, the case must be considered moot. Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895).

Plaintiff's claim would unquestionably be mooted had the November 7 election, the last election of the year, already taken place. United Public Workers v. Mitchell, 330 U.S. 75, 88, 67 S.Ct. 556, 91 L.Ed. 754 (1946). Defendant contends that with the start of absentee balloting, the election is and has already begun, as a result of which plaintiff's claims are moot. Skelton v. Yates, 131 Tex. 620, 119 S.W.2d 91 (1938); Sterling v. Ferguson, 122 Tex. 122, 53 S.W. 2d 753 (1932).

The Texas Election Code is a comprehensive, statutory enactment which applies to all elections and primaries held in the state.

Under the Code, the Tax Assessor-Collector and the County Clerk have extensive functions which must be performed before an election day. The Tax Assessor-Collector must prepare current lists of voters at least 20 days before the election and again four days before election. Article 5.19a. In addition to the alphabetical master list, he must provide

each of the thirteen precinct judges with lists of the voters in their respective precincts. Finally, the defendant Registrar must maintain current records of deaths, felony convictions, and adjudications of incompetency, Article 5.18b, subd. 5.

The work of the County Clerk begins upon receipt of the voter lists. The Clerk must order the ballots from the printer. From time of order, it takes a minimum of ten days for the ballots to be printed and delivered to the County Clerk. After receipt, the Clerk must check them for accuracy and count them. The Clerk must prorate the ballots among the various precincts. Finally, three days before election day, the Clerk must cause the ballots and election supplies to be delivered to the precinct judges by the County Sheriff.

The population of Waller County is not large. Only 6,845 ballots have been ordered for this general election. The staffs of the County Clerk and the Tax Assessor-Collector are small. Experienced volunteers in sufficient numbers are not available for registering and providing ballots for 1,500 to 2,500 additional voters in a short period of time.

In view of the above facts, the Court accepts as true defendant's statement that his office could not register the plaintiff class in time for the General Election if ordered to do so on November 3, the date hearing on preliminary injunction was concluded. In addition, based on the evidence presented, the Court finds that an injunctive order issued on October 24 probably could not have been followed or enforced without disruption of the November 7 election. See Polk v. Davidson, 145 Tex. 200, 196 S.W.2d 632 (1946). October 24 was the date of the pretrial hearing in this case and was before plaintiff had amended his answer to request a preliminary injunction. In this situation, refusal of the plaintiff's request for injunctive relief on behalf of the class is clearly appropriate. Garza v. Smith, 320 F.2d 131 (5th Cir. 1970).

The Congress of the United States as reflected by 42 U.S.C. § 1973aa–1, and the Supreme Court of the United States in Dunn v. Blumstein, 405 U.S. 330, 345, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) and Oregon v. Mitchell, 400 U.S. 112, 91 S. Ct. 260, 27 L.Ed.2d 272 (1970), have recognized that the strong need to prevent election fraud justifies closing registration 30 days before an election. That same strong state interest, fully explained hereinafter, compels this Court's decision to dismiss a class action seeking to register a minimum of 1,500 people (and possibly 2,500 people) at this late date. That number could not have been registered subsequent to the filing of this lawsuit without inviting frustration of the provisions of the Legislature of the State of Texas for the *prevention of election fraud.*

Plaintiff suggests that Hamer v. Campbell, 358 F.2d 215 (5th Cir.) cert. denied 385 U.S. 851, 87 S.Ct. 76, 17 L. Ed.2d 79 (1966), holds that the lateness of plaintiff's claim cannot be considered here. The Fifth Circuit has acknowledged that the extraordinary relief granted in *Hamer* is justified only by an exceptional factual situation. Mississippi Freedom Democratic Party v. Democratic Party, 362 F.2d 60 (5th Cir. 1966). It is sufficient to note that here, unlike *Hamer,* all the equitable considerations do not repose with plaintiff.

On August 28, 1972, plaintiff prepared and mailed his application for a voter registration certificate. In prompt response, defendant sent him a questionnaire. Defendant requested its completion and return for further examination before certificate could issue. Plaintiff knew his application might be rejected, but he waited until October 5 or 6 to return the completed questionnaire, only one or two days before the close of registration. Suit was filed on October 12, five days after registration had closed. Service on defendant was not effected until October 18, the day absentee voting began. Plaintiff's attorney requested and was issued the

standard summons which as provided by law gave defendant 20 days to file an answer. Under the summons defendant's answer would not have been required until November 7, election day. Thus, in a situation where time was critical, both plaintiff and his attorney failed to act with requisite diligence and speed. In so finding, this Court does not imply that a state court could not entertain the claim of a single voter for relief under Article 5.17a, even though it should be filed after the close of registration. Plaintiff so contends but this Court, finding it unnecessary and a question of state law, expresses no opinion in this regard at this point.

### B. Class Action Barred by Res Judicata

This is not the first litigation involving this questionnaire, as put in the factual frame of reference by plaintiff's complaint, motions and briefs. On March 29, 1972, by Memorandum and Order, this Court decided the case of Wilson v. Symm, 341 F.Supp. 8 (S.D. Tex.1972). That case was filed December 15, 1971 on behalf of seven named students from Prairie View A & M University (two of whom withdrew before trial), a young people's political association, and a corporation which engages in "public interest litigation." The Court was informed that the able counsel who appeared were provided by the American Civil Liberties Union. Wilson v. Symm also concerned the questionnaire used by defendant Symm as an aid to determining residency of applicants for voter registration. Mr. Ballas' attorney, by pleadings, briefs and in open court, quite candidly admitted that he is seeking a late reconsideration of this Court's decision in Wilson. Although a different named plaintiff and a different attorney are here involved, the defendant and the constitutionality of defendant's use of the questionnaire complained of are identical to plaintiff's complaint in Wilson.

Even accepting the premise that a second lawsuit by another plaintiff is not barred by res judicata, this class action must be. The purely legal question of the questionnaire's constitutionality was posed and answered in Wilson. That decision applies directly to the five named plaintiffs and has precedential effect on the claims of all class members here. Indeed, if they are still at Prairie View A & M University, the five plaintiffs in Wilson are members of the alleged plaintiff class here. This demonstrates the inappropriateness of allowing a class action to challenge practices which the individual members have already unsuccessfully litigated.

### C. The Constitutional Claims of the Class

With regard to the constitutionality of the questionnaire, plaintiff refers the Court to two events occurring subsequent to the decision in Wilson v. Symm; first to the case of Whatley v. Clark, Civil Action No. 5474 (E.D.Tex. October 2, 1972), and secondly, to a bulletin issued by the Honorable Robert Bullock, Secretary of State of the State of Texas, also under Texas law its Chief Election Officer. Neither event mandates a conclusion contrary to that reached in Wilson, for reasons which follow.

### (1.) Wilson v. Symm and Whatley v. Clark Compared

Whatley v. Clark is not precedential authority here for a number of reasons. With deference and respect for the opinion of the distinguished Judge who decided Whatley, but consistent with Wilson, I hold the opposite view on the merits of the matter. It is not infrequent that two lower federal courts reach an opposite result. In my opinion, Art. 5.08(k) is not unconstitutional in any respect. It was my intention to so hold in Wilson. But, since plaintiff has urged reconsideration of Wilson and the Court in Whatley distinguished Wilson, I shall give the reasons which lead me (1) to reiterate my holding in Wilson, and (2) not to accept the rationale of Whatley. While facially distinguishable,

*Whatley* and *Wilson* are not distinguishable in principle.

For the purpose of clarity only, and with no intention to make an unseemly comparison, I shall point out the particulars, wherein and why, I am not in agreement with *Whatley*.

■ A court which is called upon to interpret a provision such as 5.08(k) must give most serious consideration to related provisions of the Constitution and laws, and the design and purpose of the Legislature in enacting the Code. See Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Extracted language, words and sections of a statute which may not be self-explanatory assume a more precise meaning when considered in such light. It is spectacularly so with Article 5.-08(k).

Suffrage, the qualification of voters, and conduct of elections for the protection of the purity of the ballot have been a continuing basic concern of the people of Texas since the formation of the Republic, evidenced by the first and each succeeding constitution, as well as the extensive enactments of its Legislature. See Sections 1–5, Article VI, and Article XVI, Section 2, Constitution of the State of Texas, Vernon's Ann.St., together with Interpretative Commentary following each section; and the Texas Election Code, supra. An example of the attitude of the people of Texas with respect to the purity of the ballot as a compelling state interest is forcibly expressed in Sec. 4, Art. VI, supra, as follows:

§ *4. Elections by ballot; numbering, fraud and purity of elections; registration of voters*

Sec. 4. *In all elections by the people the vote shall be by ballot and the Legislature shall* provide for the numbering of tickets and *make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box* and the Legislature may provide by law for the registration of all voters in all cities containing a population of ten thousand inhabitants or more. As amended Aug. 11, 1891, proclamation Sept. 22, 1891.

*Wilson* and *Whatley* each recognizes that *any exclusion* from the franchise must be necessary to promote a compelling state interest. In *Wilson,* as here, plaintiffs contended Art. 5.08(k) singled out students for special treatment in determining residency, in the absence of a compelling state interest. Plaintiffs there, as here, equated such action with an exclusion of the franchise. In *Wilson* this Court found such equal protection attack to be fully answered by Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). The equal protection attack in *Whatley* was the same as in *Wilson,* but the focus of *Whatley* was on (i) the word "indefinite", and (ii) the failure of defendants to support the result by demonstrating any compelling state interest. (It is obvious that the judge in *Whatley* had some reservation about such apparent lack of such state interest. It would appear that in *Whatley* the court was without assistance or enlightenment from counsel *on the law* in this regard.)

In testimony quoted by the Court in *Whatley,* the Secretary of State and Chief Election Officer Mr. Bullock denied the existence of "purity of the ballot" as a compelling state interest, and *in fact found no administrative justification* for the special provisions contained in Art. 5.08(k) as a means of preventing vote fraud, and said 5.08(k) created an inconvenience in absentee voting for the County Clerks and student absentee voters. Very potent testimony, but under the law and facts here, it would be more appropriately addressed to a Texas legislative hearing. The opinions of the Chief Election Officer would be entitled to respect and weight in an appropriate cause, but where as here, the legislative intent is clearly ascertainable from the applicable provisions of the Texas Constitution and laws, such opinion becomes irrelevant.

It is not clear whether Bullock's testimony was offered by plaintiffs or defendants. However, *Whatley* found that "Defendants . . . *apparently* rely on no compelling state interest . ." and that *Bullock* expressed the opinion that 5.08(k) was passed "to discourage students from voting." (Emphasis added.) Bullock left no doubt that *he was unsympathetic with the enforcement of 5.08(k)*. Confronted as he was with the contentions of defendants and the Bullock testimony, it is not surprising that the busy *Whatley* court was led into the result reached in *Whatley*.

■ The Court rejects the contention made by plaintiff here that the wrong judicial test was applied in *Wilson* and that the "necessary to effect a compelling state interest" standard must be used. Only a reasonable relationship to the state interest in determining true residence is necessary. See Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

I turn now to how the Texas Election Code reflects an intent to promote a compelling state interest, through Art. 5.08 and its component Art. 5.08(k) and related provisions.

The design and purpose of the Code is expressed at the outset, in pertinent part as follows:

*Article 1.01 Design of the Code*

The *aim* in adopting this Code is to state in plain language the laws governing the nomination and election of officers and of holding other elections, *to simplify, clarify and harmonize the existing laws in regard to parties, suffrage, nominations, and elections, and to safeguard the purity of the ballot box against error, fraud, mistake and corruption, to the end that the will of the people shall prevail and that true democracy shall not perish from the Lone Star State*. To that end the provisions of this Code shall apply to all elections and primaries held in this State, except as otherwise provided herein. Acts 1951, 52nd Leg., p. 1097, ch. 492, art. 1.

Chapter 5 of the Code is entitled Suffrage. While not exclusively so, it contains the provisions which detail the immediate background for the interpretation of 5.08(k). These demonstrate a legislative intent to identify each "qualified voter" and to provide the manner of his or her voting, to the end that error, fraud, mistake and corruption may be prevented in the election process.

Article 5.02, as amended in 1966, 1967 and 1968, entitled "Qualification and requirements for voting," now provides in pertinent part as follows:

*Art. 5.02 Qualification and requirements for voting*

Every person subject to none of the foregoing disqualifications . . . who shall have resided in this state . . . within the district or county in which such person offers to vote, and who shall have registered as a voter, shall be deemed a qualified elector. No person shall be permitted to vote unless he has registered in accordance with the provisions of this code.

Having thus made "residence" a vital requirement for every applicant to qualify as a voter, the Legislature has said that legal residence (i. e., domicile) determines the place where one registers to vote. Art. 5.10a, as amended, Sec. 42a, Appendix to Chapter 5.

Having made residence a prerequisite to voter registration and having established the precinct in which to register, quite logically, the Legislature has also made provision for proof of residence by an applicant to the "county collector" (Registrar), if required by him, as follows:

*Art. 5.21 Proof of residence*

If the county collector has reason to believe that one who applies to pay his poll tax or secure his certificate of exemption from its payment, *has falsely stated* his age, occupation, precinct of his residence, or length of his residence in the State, county and city, or *any* other *matter touching his qualifications to vote, he shall require proof*

*of such statement*; and, if on inquiry, he is satisfied that said person has sworn falsely, he shall make a memorandum of the words used in such statement, and present the same to the foreman of the next grand jury of if the County Collector does not personally know one who applies to pay his poll tax or secure his certificate of exemption from its payment as being a resident in the precinct which such person claims as that of his residence, it shall be the duty of such collector to require proof of such residence or of such other facts as may be necessary. Acts 1951, 52nd Leg., p. 1097, ch. 492, art. 53.[1]

Further provision for such proof to the registrar is made in Art. 5.17a entitled "Challenge of registration; appeal," which provides in part as follows:

*Art. 5.17a Challenge of registration; appeal*

(1) Challenge of applicant. *Any person applying for registration may be challenged by the registrar or deputy taking his application or by any registered voter of the county.*

. . .

(2) Challenge of registered voter. *Any registered voter shall have the right to challenge the registration of any other registered voter in his county* by filing with the registrar of voters a sworn statement setting out the grounds for such challenge. . . .

(3) Jurisdiction of district court; trial of appeal. The district courts of this State shall have jurisdiction to hear and determine appeals from decisions of the registrar refusing an application for registration and from decisions of the registrar either canceling or refusing to cancel a registration. . . .

The Legislature's manifest concern for maintaining purity of the ballot is emphasized by subsections (1) and (2) of Art. 5.17a. In a very simple but effective way, provision is made for citizen participation in protecting purity of the ballot. This is directly related to residence, for whoever is a qualified voter in a particular precinct becomes of vital importance to every other voter in such precinct in any election other than a county-wide election. Examples of such which this Court will judicially notice are party precinct committeemen; justices of the peace; constables; state senators and representatives; and, congressmen in counties which embrace more than one congressional district. Correct delineation of precinct lines and restricting the suffrage to those residents in the precinct as defined, is the only reasonable and fair way of having such public officials elected by those whom they are elected to represent.

With residence, the determination of residence, and location of residence having been made so vital to the voting process, guidelines for interpretation of residence were needed for the 254 registrars in Texas. Certainty and uniformity caused the Legislature to promulgate the rules for such determination. Without such rules the 254 registrars in Texas would be without the requisite guidelines.

■ In 1967 and 1971, the Legislature amended Art. 5.08, which was originally designed for such guidance. It is now denominated "Rules for determining residence," and contains 13 paragraphs, of which Art. 5.08(k) is only one. All must be read and considered in making any determination of residence of a student applicant or voter because and for example, any student must also be single or married, male or female, etc.; and, may also come under other categories of Art. 5.08.

■ Article 5.08(k) first requires that if a student desires to vote in the place where he attends school, he must in fact be a bona fide resident of such place. Such requirement of bona fide residence is uniform for all citizens. But,

1. Because the poll tax was held unconstitutional, it has been supplanted by the voter registration certificate.

Art. 5.08(k) contains a rebuttable pre-.sumption to the effect that a student applicant's residence shall be constructed to be where his home was before he became such student. This is an ever so slight veneer or guide for determining residence (domicile). In determining domicile at common law, a change from one domicile to another requires proof. Together with physical removal of a person, there must be an accompanying intent to change domicile. Otherwise, the body will have moved, but the domicile will have remained where it was next in time prior thereto. This is solely a matter to be determined under rules of local law; it is solely of state concern.

■ Secondly, 5.08(k) provides that in showing the bona fides of his claim to residency where he attends school, a student must show that "he intends to remain there and to make that place his home *indefinitely* after he ceases to be a student.[2]" Indefinitely is the key word for examination.

"Indefinitely" is a simple, well understood word. For the definition, one need not turn to an unabridged dictionary. The following definitions are from Webster's Seventh New Collegiate Dictionary, 1970:

definite—having distinct or certain limits; precise.

indefinite—not precise; vague; having no exact limits.

As contrasted with "permanent," the latter is defined in the same dictionary as follows:

permanent—continuing or enduring without fundamental or marked change.

The synonym noted in the dictionary for "permanent" is "lasting":

lasting—existing or continuing a long while.

The distinction between "indefinite" and "permanent" *in the context of time* has been stated with precision by the Supreme Court of Florida, as follows:

Indefinite is more synonymous with 'temporary' than with 'permanent' for it contemplates that the condition will end at an unpredictable time, whereas 'permanent' does not contemplate that the condition will cease to exist. Twisdale v. Womack & Martel, Fla., 148 So.2d 21, 23.

The etymology of the words, and correct grammar as well, demonstrate that "indefinite" should not be equated with "permanent.[3]"

■ Moreover, the applicable rules of statutory construction lead to an opposite result. Where alternative constructions of legislation are possible, an interpreting court must adopt the explanation which will uphold the provision. Anniston Mfg. Co. v. Davis, 301 U.S. 337, 351, 57 S.Ct. 816, 81 L.Ed. 1143 (1937). By interpreting indefinite to mean permanent, *Whatley* would require students to make proof of their intention for a much longer duration than actually intended by the Legislature, when it said and meant indefinite. In so doing, *Whatley* found 5.08(k) to constitute an exclusion of the franchise, an unconstitutional result. Even if equating indefinite with permanent were an acceptable interpretation, the duty of the Court in applying the above-mentioned canon would be to accept the interpretation or definition of

---

2. Although the questionnaire inquires of an applicant as to whether he intends "to reside in Waller County indefinitely," in his decisional process defendant Symm does not consider that question solely dispositive of the issue of bona fide residency with respect to any application. For example, defendant testified that, if a University student is from the Hempstead area, he is considered a resident without regard to his intentions upon graduation. Similarly, a married student

will be considered a resident, irrespective of his answer to the question.

3. A three-judge United States District Court sitting in New Hampshire, in Newburger v. Peterson, 344 F.Supp. 559 (N.H.1972), cited in *Whatley*, also equated indefinitely with permanently. It being my view that Art. 5.08(k) is predicated upon and consistent with such compelling state interest, I will omit any discussion of Newburger v. Peterson.

"indefinite" which would uphold the constitutionality of 5.08(k) and to reject equating it with "permanent." In contrast, by applying the latter definition of "indefinite," Whatley found Art. 5.08(k) to be constitutionally defective.

Much more could be said, but the foregoing must suffice to demonstrate that residence is the most vital criterion of the Code for determining who may vote and where. It is common to all who would vote. It is not a creation of the Legislature either to enfranchise, or disenfranchise, students as such. Any qualified student voter, *like any other qualified voter*, may exercise his franchise in the precinct and county *of his bona fide residence*. Art. 5.08(k) simply specifies in a reasonable manner two criteria which among others shall govern the determination of such bona fide residence—(i) the rebuttable presumption treated here and in *Wilson*; and (ii) an intent of applicant to remain at the place he is attending school indefinitely after he ceases to attend school. Art. 5.08(k) is not self-contained and exclusive. All other applicable criteria contained in Article 5.08 must be given appropriate consideration in determining the bona fide residence of any particular student applicant or voter.

■■■ The State of Texas has a compelling state interest in suffrage, nominations, and elections to safeguard the purity of the ballot box against error, fraud, mistake and corruption. The Legislature has determined that Art. 5.08 in its entirety is necessary for the promotion of this state interest. I agree. It is a reasonable exercise of the state's right and duties under powers reserved to it under the federal constitution. By effectuating such compelling state interest insofar as it utilized Art. 5.08(k), the State has not violated in any sense whatsoever any right of any plaintiff identified in *Whatley, Wilson,* or *Ballas,* guaranteed him under the Equal Protection Clause or under any other provision of the federal constitution.

## (2.) The Bullock Bulletin

*Whatley* was decided October 2, 1972. On October 3, the Secretary of State of the State of Texas, as Chief Election Officer (Mr. Bullock), issued a bulletin which advised that "No county registrar may require any affidavits or questionnaires in addition to the information required on the application for a voter registration certificate," citing as authority Whatley v. Clark. October 7 was the last date for the issuance of registration certificates. On October 5, after conferring with his counsel, defendant Symm informed Bullock by letter of his intention to follow the ruling in Wilson v. Symm and to continue to apply Article 5.08(k).

As a legal interpretation of a judicial decision, the Secretary's bulletin is *clearly erroneous*. As above mentioned, *Whatley* held only that the "intent to remain indefinitely" portion of Art. 5.08(k) was invalid. Despite the express language of the *Whatley* Court to the contrary, Bullock interpreted *Whatley* to mean that *all* of 5.08(k) was unconstitutional, not just the "indefinitely" provision. Bullock was a party to Wilson v. Symm. He answered and was represented at all hearings and trial by an Assistant Attorney General of Texas. Bullock's counsel approved in writing the judgment of this Court based upon its Memorandum and Order of March 29, 1972, awarding judgment to defendants in which the Court found:

> Accordingly, this Court concludes that Article 5.08(k), on its face and as applied by defendant Symm, does not violate the Equal Protection Clause of the Federal Constitution. 341 F. Supp. 8, 17 (1972).

For some reason, not explained in the testimony of Bullock contained in *Whatley*, or offered by plaintiff here, Bullock chose to ignore the opinion of this Court in Wilson v. Symm and to rely solely on *Whatley*.

Apart from the constitutional question, the exchange of correspondence be-

tween Bullock and Symm presents a question of state law. The question is whether the Secretary's power to obtain election law uniformity among the counties includes power to make binding determinations of state law. If the Secretary's authority should extend that far, then Symm as a state official should follow the Secretary's bulletin regardless of its correctness. If the Secretary does not have such power, his bulletin must be considered merely advisory and thus defendant Symm who as an elected official with express authority and duty under the Texas Election law, has the authority and duty to make an independent assessment of the election law.

Apparently, there is no disagreement between the parties here as to the Secretary's authority. Plaintiff admits that the Secretary's opinions are unenforceable at law and are not binding. The Secretary acted well within his authority in bringing the *Whatley* case to the attention of the county Tax Assessor-Collectors, but clearly repudiated the position taken by him in this Court in Wilson v. Symm, as well as the judgment in Wilson v. Symm, which was favorable to Bullock and consistent with his contentions, as well as approved by his counsel in the case. The limitations on the Chief Election Officer's authority are discussed in Bullock v. Calvert, 480 S. W.2d 367, 370 (Tex.1972).

 The bulletin was offered in evidence by plaintiff Ballas and urged in his brief to be evidence of the contemporary construction of 5.08(k) by the Texas Chief Election Officer. Because of the facts reviewed above, I find such Officer's construction of 5.08(k) to be utterly lacking in candor or credibility; legally incorrect; misleading; in excess of his statutory authority; and, irrelevant. Therefore, the bulletin is not competent evidence to support plaintiff's contention that Art. 5.08(k), and use of the questionnaire by Symm violate the Equal Protection Clause of the Fourteenth Amendment.

D. *Applicability of the Civil Rights Act of 1964 to the Class*

In addition to averments of unconstitutionality, plaintiff claims that defendant's procedure violates Subsection (a)(2) of § 1971, Title 42, U.S.C., a part of the Civil Rights Act of 1964. That same claim was originally made by plaintiffs in Wilson v. Symm; however, their final amended complaint deleted that allegation, 341 F.Supp. at 10.

In discussing § 1971 in his complaint, plaintiff states that, "Although the allegation is juridically *irrelevant*, Plaintiffs further allege that virtually every member of the class represented by the named plaintiff is a black citizen of the United States and of the State of Texas." (Plaintiff's Complaint at p. 5; emphasis added.) This statement was confirmed by plaintiff's counsel at hearing. The only reasonable construction of plaintiff's contention is that Section 1971 applies to voting procedures which discriminate in a non-racial as well as racial setting. In this regard, the Court judicially notices that the student body at Prairie View is predominantly Negro.

The provision of Section 1971 referred to by plaintiff requires that:

No person acting under color of law shall—

(A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.

42 U.S.C. § 1971(a)(2).

 Although this provision is broadly written, to argue that it applies without regard to race ignores the statute as a whole, its legislative history, and prior judicial construction. The Civil Rights Act of 1964 and Section

1971 of the Code clearly aim at eliminating racially motivated practices which restrict exercise of the elective franchise.

Paragraphs (2) and (3) of subsection (a), § 1971, were added to the Code by the Civil Rights Act of 1964. Subsection (a)(1), part of the prior section, provides that all citizens shall be entitled to vote without distinction of race or color. Subsection (a)(2) begins with paragraph (A), quoted above and relied on by plaintiff. Paragraphs (B) and (C) of subdivision (2) forbid the denial of the right to vote because of inconsequential errors or omissions in an applicant's application, registration or other act requisite to voting, and prohibit unevenly apply any literacy test. Thus the introductory provision of the section, while extremely broad, applies specifically and exclusively to situations of racial discrimination. The paragraphs following the provision in question, relate to practices which historically attended efforts to prevent Negroes from voting.

Later subsections of the section relate to enforcement by the Attorney General of the United States. For example, subsection (e) provides that the Court must determine whether any right secured by subsection (a) of which a person may have been deprived, was deprived him because of his race or color. Because it is clear that suits commenced by the Attorney General relate to cases of racial discrimination, it is logical to conclude that the Act as a whole applies only to cases of racial discrimination. The Congress would not have intended a broader application of the Act to individuals suing to enforce their rights than to the Attorney General.

As part of the Civil Rights Act of 1964, the provision must be presumed to relate to the racial situation. That assumption is borne out by the House Report of the Bill, 1964 U.S.Code Cong. & Admin.News, p. 2391, as well as the report cited by plaintiff's brief, Id. at 2490.

Finally, the judicial gloss placed on § 1971 by the courts confirms the conclusion that the section is meant to apply solely to a racial discrimination situation. South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) refers to the section as outlawing "some of the tactics used to disqualify Negroes from voting in federal elections." Id. at 313, 86 S.Ct. at 811. The only case to apply § 1971 to a student voting situation is Shivelhood v. Davis, 336 F.Supp. 1111 at 1115 (D.Vt.1971) by another United States District Court. The case is distinguishable on its facts and the opinion omits any analysis of reasons for the court's conclusion. There is no reported precedential authority on the point from the Court of Appeals for the Fifth Circuit.

In summary, the Court concludes that 42 U.S.C. § 1971 must be considered inapplicable here.

Despite the statement of juridical irrelevance contained in the last sentence of Paragraph IX of his complaint, plaintiff in a later brief suggests peripherally that *it might* be a case of racial discrimination. (See pp. 16 and 17, Plaintiff's Memorandum Brief, filed October 16). The plaintiff carefully avoids asserting it is a case of racial discrimination; he only says he does not concede it is *not* a racial discrimination case although such statement in brief is contrary to Paragraph IX of his complaint. This suggestion was not predicated on any pleading. However, the Court will review the contention, based on the record in this case as well as in Wilson v. Symm.

As presented by the evidence, defendant Symm generally requires the questionnaire of those applicants whom he does not personally know. Although non-students occasionally receive a questionnaire, this group tends to be students because they are the ones whom Symm does not know. An exception to this generality are those students—without regard to race—whose parents live in Waller County and thus are already

known to defendant. Neither the application form for registration, nor the questionnaire, elicits any statement as to the race of the applicant.

Quite clearly then, it is students and others to whom it may be sent, not Negroes as such, who are required to complete the questionnaire. As evidenced by the named plaintiff and one other identified in the evidence by plaintiff, Caucasian students are subject to the requirement as well as Negro students. And, those Negroes in Waller County who are not students are not required to complete the questionnaire. Thus the differential treatment involved here affects students primarily, a different class from that protected by § 1971.

Considering students to be a class and Negroes to be a class, the two classes overlap considerably because Prairie View A & M University is a predominantly Negro institution. This fact is fortuitous however, and does not demonstrate in and of itself, nor inferentially has plaintiff shown by any substantial evidence, the racial bias necessary to support a § 1971 claim. This Court found in Wilson v. Symm, 341 F.Supp. at 13, and here confirms that the questionnaire procedure arose out of the problem of determining the residency of students, not from any racial discrimination on the part of Waller County officials. Article 5.21 makes it the duty of the Registrar to inquire into residency of an applicant in a proper case, and the applicable provisions of Article 5.08 [including but not limited to 5.08(k)] furnish him the rules for determining residency.

In summary, because the constitutional issues raised herein are identical to those raised by other members of this same class and because the statutory claim is without foundation, the Court must refuse to certify this suit as appropriately a class action. F.R.Civ.P. 23(c)(1).

Having disposed of the procedural and class action contentions of plaintiff, I now turn to defendant's contention that this Court should abstain.

3. *The Appropriateness of Abstention*

During the course of these proceedings, four questions have been raised which, if sustained, would justify granting the individual plaintiff the relief sought, specifically, the right to vote in Waller County, Texas, on November 7, 1972.

At one level, plaintiff contends that he is a bona fide resident of Waller County and that defendant's decision to the contrary is factually erroneous. Secondly, it is asserted that defendant's questionnaire is extra-legal, not authorized by statute, and in fact barred by the need for uniformity, the Secretary of State's directive of October 3, and Article 1.03. Next, plaintiff contends the questionnaire violates the federal statutory prohibition, 42 U.S.C. § 1971 (1970). Finally, and most strongly, plaintiff argues that the questionnaire and the supporting statute, Article 5.08(k), are in contravention of the Fourteenth Amendment of the United States Constitution. The first two contentions are essentially questions of state law; the last two of federal law.

As previously discussed, the Court holds in favor of the defendant on the federal questions, viewing the Civil Rights Act as inapposite and the state statute and defendant's procedure as constitutionally permissible. But independently of such holdings, the Court views this case as appropriate for the application of the doctrine of abstention.

Professor Wright discerns four separate principles which justify a federal court's abstaining from decision to allow a state court adjudication. C. Wright, Federal Courts (2nd ed.) § 52 (1970). Two of the principles apply here: (a) avoiding a decision of a federal constitutional question where the case may be disposed of questions of state law, and (b) avoiding needless conflict with the administration by a state of its own affairs. Professor Wright discerns these principles but did not formulate

them; they have been a part of the fabric of the federal jurisprudence on the subject for decades.

The claim of an individual to the right to vote in a particular county can and should be resolved in state court. Article 5.17a(3) of the Texas Election Code provides the state district courts with jurisdiction to hear appeals from a registrar's denial of an application for registration. Such trials are de novo and given priority if an election is pending within 60 days. Obviously a determination by the state court in favor of plaintiff's claim to Waller County residency, would moot the more difficult and uncertain legal issues and avoid a constitutional decision by the federal courts. See, Manard v. Miller, 53 F.R. D. 610 (E.D.Va.), aff'd 405 U.S. 982, 92 S.Ct. 1253, 31 L.Ed.2d 449 (1971). As the Supreme Court held in another context, "As adequate state court review of an administrative order based upon predominantly local factors is available to appellee, intervention of a federal court is not necessary for the protection of federal rights." Alabama Public Service Commission v. Southern Ry. Co., 341 U. S. 341, 349, 71 S.Ct. 762, 768, 95 L.Ed. 1002 (1951).

This Court has on several occasions favored use of carefully established state procedures for resolving controversies without resort to federal court. Press v. Pasadena Independent School District, 326 F.Supp. 550 (S.D.Tex.1971). At the close of the October 30 hearing, the Court expressed the opinion that the State District Court of Waller County, even at that late date, might hear and favorably rule on Ballas' claim to bona fide residency in Waller County. In response, plaintiff's attorneys declined and said it would require as many as 2,500 hearings, referring, of course, to the alleged class, without reference to a single appeal for plaintiff, individually.

Abstention is even more appropriate as to plaintiff's second claim—that defendant's questionnaire is extra-legal and unauthorized by state law. Defendant's use of the questionnaire is based upon his interpretation of Article 5.08(k) and was vindicated by this Court in Wilson v. Symm. As expressed in the October 3 bulletin, the Texas Secretary of State is of the view that any inquiry as to the residency of students is improper. Thus plaintiff's contention not only presents the question of which state official is correct as a matter of constitutional law, but also poses the question of the Secretary's authority to interpret state law. If the Secretary's power to compel uniformity in the application of the election law Article 1.03, extends to providing binding interpretations of the election code, then defendant must yield on the basis of state law.

As discussed above, the Court resolves this conflict in favor of defendant, finding that the Secretary has no authority to issue binding legal interpretations of the statute. Nonetheless, that determination of a state law question is not authoritative and could be rendered invalid by a state court determination to the contrary. Because of the tentativeness of such decisions, and particularly where, as here, the issue involves questions of a state official's authority, a federal court should abstain from decision. See Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970). Abstention under these circumstances is appropriate even in an election situation. Reed v. Board of Election Commissioners, 459 F.2d 121 (1st Cir. 1972); Harris v. Samuels, 440 F.2d 748 (5th Cir.), cert. denied 404 U.S. 832, 90 S.Ct. 77, 30 L.Ed.2d 62 (1971). Because this second contention applies to the class's claim of the right to vote in Waller County, abstention is also appropriate to the class action claim.

Federal court abstention is warranted as to the class action claim on another ground. The remedy sought by plaintiff, a permanent, mandatory injunction against a state administrative officer, the voter registrar of Waller County, is one of the most severe of a court's judicial actions. Mandamus is appropriate only where the state official has failed to perform a non-discretion-

ary act, or has clearly abused his authority in a discretionary matter. Crane v. Tunks, 160 Tex. 182, 328 S.W. 2d 434 (1959). Mandamus is unavailable where alternative means of obtaining review of the official's action are provided. Manion v. Lockhart, 131 Tex. 175, 114 S.W.2d 216 (1938).

 As will be demonstrated in Section 4 of this Memorandum and Order, the voter registration applications of the class were obtained and submitted to defendant Symm by Deputy Registrar Sams in patent violation of the statutes and procedures governing such matters. Because of this, the "qualified voters" referred to in plaintiff's definition of the class are non-existent as far as the record here is concerned. But in addition, defendant's refusal to accept these applications was obviously in accordance with his statutory duty to insure the validity of the voter rolls. Indeed, had he not refused the applications, he would clearly have abused his authority in failing to perform his duties. Under these circumstances, a court must refuse to mandamus the official. Also, because state procedures for review of the rejections are available, mandamus relief is inappropriate. Gonzales v. Stevens, 427 S.W.2d 694 (Tex.Civ.App.—Corpus Christi, 1968, writ ref n. r. e.). In this situation, a federal court must abstain from taking the requested action.

4. *Remedy to be Granted Plaintiff*

 For the foregoing reasons, neither plaintiff individually nor the proposed class is entitled to relief under the facts and law as plead and proved by plaintiff. Nevertheless, it has been apparent to the Court during these proceedings that plaintiff's case has been so plead and proved as to concentrate attention toward obtaining relief, not for Mr. Ballas individually, but for the whole class as defined by plaintiff. The complaint, the brief, and the proof presented by plaintiff, all evidence an uncommon interest in the broad constitutional issues, predicated upon the Equal Protection Clause of the Fourteenth Amendment. The thrust for relief extended primarily to the alleged class, with little apparent consideration having been given to plaintiff's more basic and obvious federal constitutional rights under the Due Process Clause, which inhere in him as an individual under the undisputed facts, as plead and proved, but not held in common with the alleged class. Therefore, despite the prior adverse holdings with respect to the constitutional issues expressly raised by plaintiff, it becomes the duty of the Court to consider plaintiff's entitlements if any for relief under the Due Process Clause pursuant to his prayer for general relief.

On October 24, Mr. Ballas testified that after receipt of the letter of rejection from defendant dated October 5, he was dissatisfied and came to Houston to seek legal advice. After inquiry, he employed Mr. Maness. His purpose was to obtain the right to vote in the General Election to be held November 7. He had no part or interest in the late voter registration drive conducted by the Hon. Eristus Sams, Deputy Registrar. In the opinion of the Court, Mr. Ballas came to Houston and his attorney's office, not as part of a crusade to register prospective student voters, or merely to relitigate Wilson v. Symm of which he had no specific knowledge, but out of a sincere desire to vote in Tuesday's election.

Sensing this tension between the basic desire to vote motivating the named plaintiff, and his attorney's apparent zeal for giving priority to the class action, the Court has throughout these proceedings made separate inquiry as to the facts surrounding plaintiff's residency as well as the rejection of plaintiff's application by defendant.

Defendant testified that plaintiff's questionnaire contained a number of blanks and one ambiguous answer, and it was these omissions which resulted in its rejection. This was not an unreasonable position for defendant to take.

In his rejection letter of October 5, defendant also informed plaintiff of his right to appeal to the state district court by reference only to Article 5.17a(3). The letter did not mention a hearing for plaintiff before defendant. There is no evidence that defendant offered or gave plaintiff the hearing required by Article 5.17a(1) which would appear to be a predicate for plaintiff to appeal under Article 5.17a(3).

Article 5.17a(1), Challenge of applicant, provides as follows:

Any person applying for registration may be challenged by the registrar or deputy taking his application or by any registered voter of the county. *If after hearing* and considering the challenge the officer taking the application is satisfied as to the applicant's entitlement to registration, he shall register the applicant, but if not so satisfied, he shall refuse to register the applicant. (Emphasis supplied.)

 The request for the questionnaire to be filled out probably fulfilled the requirement for a challenge by defendant, but certainly not as to the requisite hearing. The obvious defect in defendant's procedure was defendant's failure to afford plaintiff a *hearing* before rejecting his application. By focusing on the rejection and plaintiff's right of appeal to the state district court, defendant implied that such was the only manner in which plaintiff could be heard. Having specified such appeal, it became the duty of defendant also to notify plaintiff of his right to a hearing before exercising his right of appeal.

 This Court would not consider any relief for plaintiff, if the only question were whether or not defendant complied with Article 5.17a(1) as such. That would be a matter of concern to and for decision at the state level. However, the failure to afford plaintiff such hearing under the facts of this case, constitutes a clear deprivation of plaintiff's right to due process of law under the Fourteenth Amendment to the federal constitution.

The purpose of the statutory requirement for such a hearing is well illustrated by this case. At a hearing before defendant, missing answers could have been supplied, and ambiguous ones clarified.

At the November 3 hearing, defendant expressed a willingness to provide a hearing even at that late date, but none was requested by plaintiff. In fact, counsel for plaintiff then and there insisted defendant had no authority to conduct such a hearing or issue a registration certificate to plaintiff. However, under the law such willingness of defendant, while commendable, does not cure the defect in his procedure.

In view of the Court's holding on the class action and abstention issues, it becomes important to distinguish plaintiff's rights from those of 1,500 or more individuals, alleged by plaintiff to be a part of the class whose equal protection rights had been violated by defendant's conduct. On October 4, 5 and 6, a voter registration drive was conducted under the sponsorship and leadership of the Hon. Eristus Sams, a voluntary deputy registrar of Waller County. This occurred on the campus of Prairie View A & M University during the closing days of registration. No doubt plaintiff's counsel would contend these individuals were a part of the defined class. However, this Court is of the opinion the facts in the record do not establish them to be a part of the alleged class. Nevertheless, there are important distinctions between the posture of plaintiff and such applicants.

In his testimony, Deputy Sams evidenced a personal interest in the outcome of his voter registration drive. His testimony was to the effect that he conducted the drive in a carnival atmosphere in order to stimulate the attention and interest of students. Large numbers of application forms were indiscriminately passed out to students for

redistribution. The students also collected the completed applications. None of the students were deputy registrars. The record is silent as to the names of the students who assisted Deputy Sams. The record contains no evidence even tending to show whether or not any such student was acting as an agent for any applicant and if so, whether such student was the husband, wife, parent, or child of any such applicant. Deputy Sams testified that he was absent from the campus during most of the drive, but, in effect, that he believed the applications in his possession to have been collected in that drive. This whole procedure contravened Election Code provisions aimed at preventing possible fraud. Articles 45a(1) and (4), Mode of Registration (Supp.1972). Gonzales v. Stevens, 427 S.W.2d 694 (Tex.Civ.App.—Corpus Christi 1968) (writ ref n. r. e.). The provisions of Article 52a (Supp. 1972) which authorize and prescribe the duties of deputy registrars do not relieve such officers from the strictures of Articles 45a(1) and.(4). In registering voters, deputy registrars are required to follow the same procedure as the registrar but their authority and duties are not as extensive.

The applications now in his possession were taken to the courthouse by Deputy Sams on October 6. There, he had a conference with defendant and the County Attorney. Although Sams had ample time during the drive, he did not prepare the duplicate lists of applicants which was required by law, Guideline 4, Duties of Deputy Registrars, Secretary of State's letter of September 22, 1971. This omission was called to Sams' attention by defendant. When reminded by defendant of his duty to prepare the lists, Deputy Sams left the courthouse with the applications. He failed to furnish such lists by October 7, the last day for registration. The applications were never submitted to defendant in the form required of a deputy registrar.

■ In view of the foregoing facts, law and state of the record, for the purposes of this proceeding, this Court must treat all of the alleged applications in the possession of Deputy Sams, as being void. Articles 45a(1) and (4); and Gonzales v. Stevens, supra. Thus, the only significant fact of record common to plaintiff Ballas is that he is a student at Prairie View and the alleged applicants whose void applications are in the possession of Deputy Sams are probably students at Prairie View. The only solid evidence of the latter is that Deputy Sams' voter registration drive was conducted on the Prairie View campus and the alleged applications were collected for him from Prairie View students. This is not enough to put the alleged applicants in the same posture of plaintiff, or in the class alleged to be represented by plaintiff.

■ Because of the shortness of time, the stated indisposition of plaintiff's counsel to seek a hearing before defendant through an order of this Court or otherwise, or to proceed in the District Court of Waller County pursuant to Article 5.17a(1), and, the Court being of the opinion that defendant has been and is unaware of the above identified deprivation of plaintiff's federal constitutional right to due process, the Court will grant the individual plaintiff the relief to which he would probably be entitled had one or both of these procedures been followed. The Court is of the opinion that upon a hearing before defendant, or upon appeal to the District Court of Waller County, plaintiff would show himself entitled to a voter registration certificate, and be granted such certificate. The Court will, through the office of a temporary mandatory injunction, order defendant to provide plaintiff Ballas with a voter registration certificate, valid for the election to be held November 7, 1972, only, but void thereafter. If defendant fails to provide such certificate, the Court's order shall be deemed to constitute such a certificate for the purposes of plaintiff's voting in such election. Further, such order shall enjoin any person from interfering with plaintiff's exercising his right to vote, or voting pursuant there-

to, at the voting place designated for the voting precinct in which the campus of Prairie View A & M University is located. The order shall further provide that the case shall remain upon the Court's docket for hearing on permanent injunction and such further orders or relief as may be appropriate or necessary.

And lastly, the Court's action today on the Due Process point is not inconsistent with its action in Wilson v. Symm. In the latter, as reflected by its Memorandum and Order, the Court heard extensive proof from plaintiffs and defendant concerning the residence of each plaintiff. In the alternative, the Court found that each plaintiff had failed to prove that he was a resident of Waller County. The Court judicially notices all of such evidence, as well as its decision, for the purposes of its factual statements here. Due Process was not raised by counsel for plaintiffs. In view of the evidence based upon which the Court made its alternative finding that each plaintiff had failed to establish residence as being in Waller County, there was no occasion for the Due Process issue to be raised by the Court. And furthermore, there was no class action issue in that case, such as has clouded the presentation of plaintiff's rights here. Wilson v. Symm involved only the individual rights of the five plaintiffs.

The foregoing relief will be granted plaintiff Ballas due to the exigencies peculiar to this case and the manifest injustice which would result to plaintiff if it were not granted. The granting of such relief shall not be regarded as precedential for any purpose, or contrary to the concept of abstention applied to the federal questions sought to be raised by plaintiff's counsel on behalf of plaintiff or the alleged class.

This Supplemental and Amended Memorandum and Order shall constitute the Court's findings of fact and conclusions of law; and shall supersede the Memorandum and Order of the Court filed November 6, 1972, as well as the preliminary statement made from the bench on that date.