UNITED STATES of America, Plaintiff,

v.

STATE OF TEXAS, Mark White, Secretary of State of Texas, John Hill, Attorney General of Texas, Waller County, Texas, Leroy Symm, Tax Assessor-Collector of Waller County, Texas, Defendants.

Civ. A. No. 76–H–1681.

United States District Court,
S. D. Texas,
Houston Division.

Feb. 16, 1978.

John P. MacCoon, Dept. of Justice, Washington, D. C., Anna E. Stool, Asst. U. S. Atty., Houston, Tex., for United States of America.

David M. Kendall, Jr., First Asst. Atty. Gen. of Texas, Austin, Tex., for State of Texas, Mark White, and John Hill.

Will G. Sears, Michael T. Powell, Sears & Burns, Houston, Tex., for Waller County and Leroy Symm.

Before INGRAHAM, Circuit Judge, and SEALS and COWAN, District Judges.

## MEMORANDUM OPINION

*Prior Litigation, Legislation and Administrative Action Relating to Voter Rights of Prairie View Students*

The case which controls this controversy is *Whatley v. Clark*, 482 F.2d 1230 (5th Cir. 1973) (hereinafter "*Whatley*"). That case holds that the statutory presumption of non-residency contained in Article 5.08(k) of the Texas Election Code is unconstitutional. Much of the previous litigation relating to voting rights in Waller County is rendered inapplicable by *Whatley*; however, that prior litigation, in the interest of completeness, should be reviewed.

The two previous cases in which the courts have grappled with the problem of Prairie View A & M University (hereinafter "Prairie View") student voters are *Wilson v. Symm*, 341 F.Supp. 8 (S.D.Tex.1972) and *Ballas v. Symm*, 351 F.Supp. 876 (S.D.Tex. 1972); 494 F.2d 1167 (5th Cir. 1974) (hereinafter "*Wilson*" and "*Ballas*").

*Wilson* was an effort by five Prairie View students to compel Tax Assessor-Collector Symm to register them to vote. The case was never certified as a class action pursuant to Rule 23, Fed.R.Civ.Proc. *Wilson* was decided before *Whatley v. Clark*, 482 F.2d 1230 (5th Cir. 1973), and the court's holding in *Wilson* is predicated upon the court's conclusion (later proved incorrect by *Whatley*) that Article 5.08(k) was constitutional. The court held that the function of the challenged questionnaire was to provide student applicants a means by which to overcome a statutory presumption of non-residency. Since *Wilson v. Symm* was predicated upon an incorrect assumption concerning the constitutionality of Article 5.08(k), it now has limited authoritative force.

*Wilson* was decided in the spring of 1972. In the fall of that same year, the Honorable James Noel decided the case of *Ballas v. Symm*, 351 F.Supp. 876 (D.C.Tex.1972). The trial court decision in *Ballas*, like the decision in *Wilson*, was decided before the appellate decision in *Whatley*, and was similarly predicated upon an assumption that the statutory presumption of 5.08(k) was constitutional.

Ballas, a white student at Prairie View, complained of Symm's practice of requiring students to complete the questionnaire attached to this opinion as Exhibit A [Appendix]. The *Ballas* case was never certified as a class action pursuant to Rule 23. The court specifically declined (351 F.Supp. at 880) to certify the case as a class action.

The trial court's opinion in *Ballas v. Symm*, 351 F.Supp. 876, at 877, discusses the fact that on October 2, 1972, the United States District Court for the Eastern District of Texas (Judge Wayne Justice) decided *Whatley*, holding at the trial court level that the statutory presumption contained in Article 5.08(k) was unconstitutional. The opinion also discusses the fact that on October 3, 1972, the Chief Election Officer of the State of Texas, Secretary of State, Robert Bullock, issued a bulletin to all voting registrars, advising that:

"No county registrar may require any affidavits or questionnaire in addition to the information required on the application for a voter registration certificate."

The trial court in *Ballas* held that this bulletin and Bullock's acceptance of Judge Justice's decision in *Whatley* was:

"Utterly lacking in candor or credibility; legally incorrect; misleading; in excess of his statutory authority, and irrelevant." 351 F.Supp. at 888.

Subsequent to Judge Noel's decision in *Ballas* in November of 1972, the Fifth Circuit decided *Whatley* in August of 1973, holding that Bullock's legal position, as stated in his memorandum, and Judge Justice's trial decision in *Whatley* were in fact legally correct and that Article 5.08(k) was unconstitutional.

In 1975, in an action which the State of Texas here contends was taken in response to Judge Noel's criticism of Secretary of State Bullock in *Ballas*, the 64th Legislature of the State of Texas passed a statute, amending the Texas Election Code. The Texas Election Code, as modified by the 1975 amendments reads:

"Art. 1.03. Secretary of State as Chief Election Officer.

"Subdivision 1. The Secretary of State shall be the chief election officer of this state, and it shall be his responsibility to obtain and maintain uniformity in the application, operation and interpretation of the election laws. In carrying out this responsibility, he shall cause to be prepared and distributed to each . . . county tax assessor-collector, . . . detailed and comprehensive written directives and instructions relating to and based upon the election laws as they apply to elections, registration of electors, and voting procedures which by law are under the direction and control of each such respective officer. Such directives and instructions shall include sample forms of ballots, papers, documents, records and other materials and supplies required by such election laws. He shall assist and advise all election officers of the state with regard to the application,

operation and interpretation of the election laws.

"Subdivision 2. At least 30 days before each general election, the Secretary of State shall prescribe forms of all blanks necessary under this Code, and shall furnish same to each county clerk.

.    .    .    .    .    .

"Art. 5.02. Qualification and Requirements for Voting.

.    .    .    .    .

(b) All citizens of this state who are otherwise qualified by law to vote at any election of this state or any district, county, municipality, or other political subdivision shall be entitled and allowed to vote at all such elections. The Secretary of State shall, by directive, implement the policies stated herein throughout the elective procedures and policies by or under authority of this state. Enforcement of any directive of the Secretary of State pursuant to this section may be by injunction obtained by the Attorney General."

Although there is no way to determine the legislative history of an Act of the Texas Legislature with certainty, the State of Texas contends (and it seems reasonable to assume) that these statutory changes were enacted in reaction to Judge Noel's statements critical of Bullock in *Ballas*.

The Fifth Circuit Court of Appeals in *Ballas v. Symm*, 494 F.2d 1167 (5th Cir. 1974) affirmed the trial court decision, emphasizing, however, two significant facts:

1. The use of the form itself did not violate the federal Constitution because the determination of whether or not an applicant was a voter was not made on the basis of the form alone, but on the contrary, was made after a hearing; and

2. There was no proof that the questionnaire itself was used as a device to prevent legal residents from voting.

The Fifth Circuit opinion by Circuit Judge Roney is drawn with precision and decides a very narrow issue, as stated at 494 F.2d at 1168:

"The precise issue which this suit seeks to determine is whether use of a questionnaire to assist in residence determination by a voter registrar is a violation of the 14th Amendment Equal Protection Clause, and the amended 1964 Voting Rights Act because only some voter applicants, but not all, were required to complete the questionnaire."

The Fifth Circuit, as did the trial court, emphasized that the case was not a class action and not properly regarded as a class action. (See 494 F.2d at 1169).

The case at bar was filed on October 14, 1976 and on March 15, 1977, this court, in an unpublished Memorandum Opinion, overruled defendant Symm's motion for summary judgment. Symm's motion for summary judgment was predicated upon a theory that the Fifth Circuit opinion · in *Ballas* was res judicata and barred the United States from relitigating the controversy relating to Waller County voting rights. The court held that res judicata was not applicable because of lack of identity of parties and because the cause of action asserted by the Government herein differs from that asserted by *Ballas*. In reaching its conclusion, the court relied upon *Southwest Airlines Co. v. Texas International Airlines, Inc.*, 546 F.2d 84, 95 (5th Cir. 1977); *Black Voters v. McDonough*, 421 F.Supp. 165 (D.C.Mass.1976). This court in its opinion of March 15, 1977, however, decided that the doctrine of abstention was applicable. This court's decision to abstain was reversed 15 days later in a one paragraph opinion. Thereafter, the factual record which is discussed below was developed in a series of hearings.

*Pleadings and Assertions of the Present Parties*

The complaint of the United States alleges that defendant Symm, by virtue of certain practices, including the use of a unique form, has abridged the right of Prairie View dormitory residents to vote in violation of their rights under the 14th, 15th and 26th Amendments to the Constitution of the United States. In oral argument, the

1248

United States has consistently contended that its cause of action is considerably broader than the cause asserted in *Ballas, supra,* in that the United States does not object to the use of the Symm form *per se,* but contends that the form is merely a part of a more pervasive pattern of conduct which has the effect and the intent of depriving dormitory students at Prairie View of their rights under the 14th, 15th and 26th Amendments.

The claims of the United States are asserted against Symm, the County Commissioners of Waller County, the State of Texas, Mark White, Secretary of State of the State of Texas, and John Hill, Attorney General of the State of Texas.

Hill and White answer by alleging that they have done everything within their power to guarantee the dormitory students of Prairie View their rights under the 14th, 15th and 26th Amendments and also assert that the use of the Symm questionnaire has had the practical effect of discouraging applicants for registration from completing the registration process. John Hill also asserts a cross-claim against Leroy Symm, stating that on September 1, 1977, the Secretary of State adopted Emergency Rule 004.30.05.313 prohibiting the use of questionnaires of the type employed by Symm. John Hill asserts that under the Texas Election Code, the Secretary of State had authority to issue this Emergency Rule, and prays that this court enjoin Symm from continuing to use the questionnaire contrary to the directions of the Emergency Rule adopted by the Secretary of State.

In answer to the cross claims asserted by White and Hill, Symm has filed a cross-claim against White asserting that White's Emergency Rule 004.30.05.313 is contrary to the laws of the State of Texas and in excess of the legal authority of the Secretary of State, and requesting this court to enter a Declaratory Judgment finding that White had no authority to issue (1) Emergency Rule 004.30.05.313 and (2) a letter of September 1, 1977 to Mr. Symm prohibiting Symm from continuing to use any voter registration procedure which required an applicant to provide any written information not required by Article 5.13b, subdivision 1, of the Texas Election Code.

In oral argument, counsel for Symm requested the court to invoke its pendent or ancillary jurisdiction for the purpose of entering a Declaratory Judgment to the effect that White has no authority to issue the Emergency Rule and the letter in controversy.

## EVIDENCE IN PRESENT CASE

*Testimony of Prairie View Students and Administrators*

Sidney Hicks is a full time student at Prairie View. He resides in the dormitory and is active in student affairs. Before commencing college, he lived in Navarro County, Texas.

Students at Prairie View commenced their efforts to vote in Waller County in 1966. The most recent drive to encourage students to vote was in March of 1976. In March of 1976, Mark White, the Secretary of State, and a number of his deputies visited the campus to assist students to register and vote. Hicks believes that White's staff was extremely helpful, but he cannot testify that White did everything possible to aid the students in their desire to register and vote in Waller County.

During the drive to register students in the spring of 1976, Hicks, accompanied by others, visited Mr. Symm to discuss with him the desire of many Prairie View students to register and vote in Waller County, and their belief that they were legally entitled to do so. Symm explained to Hicks and his companions that allowing students to register and vote would not be fair to permanent residents of Waller County who had devoted their entire lives to the county and who would be present in the county long after the students were gone. Symm further explained that as he viewed the matter, students and military personnel fell into the same category and neither were entitled to be routinely registered on the same basis or by the same procedures as "permanent" residents.

The town of Prairie View is located within Precinct 12 of Waller County. In the 1976 election, Hicks became a candidate for city councilman for the town of Prairie View and was elected, even though the bulk of the students at Prairie View University were not registered voters. He attributed his victory at the polls to the fact that the registered voters in Prairie View approved of his efforts to assist and encourage qualified students to register and vote.

In an effort to register and vote in Waller County, Hicks filled out the Symm questionnaire. He stated in the questionnaire that he was a resident of Prairie View, lived in the dormitories, was a full time student, returned to his parents' home in Nacogdoches on holidays and in the summers, spent approximately 75% of his time at Prairie View, and regarded Prairie View as his residence while he was pursuing his studies. He was not allowed to register in Waller County and in the 1976 election was able to vote only by driving approximately 300 miles to his parents' home in Navarro County.

Hicks, throughout, has been aware that he and other students may have a legal right to request federal registrars to come to Waller County to assist in the registration of students. He states that he and other students have refrained from pursuing this remedy because they did not wish to create hard feelings, hoped to create a feeling of amity in Waller County, and to make Waller County the best county in the state.

Hicks testified without equivocation that dormitory students at Prairie View were simply not allowed to register in Waller County.

Hicks testified that during the voter registration drive of 1976, he, through the student organization in which he was active, kept detailed records concerning the number of applications to vote by students. He testified that over 1,000 application cards were forwarded to Mr. Symm. In one of his conferences with Hicks, Symm told Hicks that only 700 of these were received. Only 27 students were registered to vote, and none of those 27 were dormitory students. All of the 27 were either Waller County natives or were married students.

Three other Prairie View students testified. All testified that they were dormitory residents, full time students, and had no definite intention concerning returning to the counties of their parents' homes when they completed their studies. All testified that they had filled out Symm's form but had not been allowed to register and vote. One of them had been allowed to register and vote, after refusal by Mr. Symm, in the county of his parents' residence. One other had not been successful in registering in the county of his parents' residence, and was not able to vote in the 1976 presidential election.

Mr. C. A. Thomas, the Registrar of Prairie View A & M University, testified that undergraduates from outside Waller County were required to live in the dormitory when dormitory space was available; that normally the dormitories had space for all students; that Prairie View freshmen were normally in the 17–19 age bracket; that all dormitory students were black; and that as of October 1976 there was a total of 2,918 students living in the dormitories.

*Testimony of University of Texas Students and Registrars from other Counties*

Students from the University of Texas testified that in Travis County students were routinely registered like other voters, simply by filling out the state prescribed registration form and furnishing the information there, and were not subjected to further or special inquiry.

The United States introduced in evidence the testimony of 70 registrars of voters, located in virtually every Texas county containing an institution of higher learning. None of the registrars of the 70 other Texas counties containing institutions of higher learning follows Mr. Symm's procedure; none applies the presumption contained in Article 5.08(k) and declared unconstitutional in *Whatley*; and none subjects students to any more rigorous scrutiny than other

applicants for voting. All feel that they are applying the law of the state properly. All state that they would not register a potential applicant, if they knew he was not a resident of the county, but that they do not have the personnel or manpower to conduct detailed inquiries with reference to each applicant.

### Testimony of Representatives from Office of Secretary of State

Mark White, Secretary of State of the State of Texas, and Leroy Beck, a deputy Secretary of State, testified that during the period from February, 1976 until October, 1976, Mr. White or his deputies made a total of ten visits to the Prairie View campus for the purpose of educating students concerning their rights and attempting to discuss the Waller County situation with Mr. Symm.

White testified that he visited Symm and explained to him that Article 5.08(k) had been declared unconstitutional in *Whatley*. White also testified that he and his deputies visited Prairie View campus on numerous occasions, attempting to explain the law to students, and attempting to assist students to register in whatever county the student felt was in fact his residence.

White testified that he told students that they could not automatically be registered where they were students but were required to establish residence in the place where they wished to vote.

White also testified that in September, 1977, he issued the following directive:

Suffrage
Use of Questionnaires or other
Written Information in
Qualifying Registrants
004.30.05.313

The Secretary of State has adopted Emergency Rule 004.30.05.313. The rule states that no questionnaire or additional information may be required of an applicant who has properly completed a voter registration application. The rule is necessary to meet administrative problems concerning voter registration for the November 8, 1977 Constitutional Amendment Election, and for this reason is adopted as an emergency rule.

This emergency rule is adopted under the authority of Articles 1.03, 5.02(b), and 5.13a, Vernon's Texas Election Code.

.313. No questionnaire or additional written information shall be required prior to the registration of any applicant for voter registration who has properly completed a voter registration form which has been prescribed by the Secretary of State.

Issued at Austin, Texas, on September 1, 1977.

/s/ MARK WHITE
Secretary of State

### Testimony of Leroy Symm

Mr. Symm was first elected Tax Assessor-Collector of Waller County in 1956 and has served continuously since that time.

Commencing about 1966, there were efforts by persons whom Mr. Symm regards to be non-residents to vote, and at that time he instituted the procedure of having each person whose good faith residence he questioned, complete an affidavit. There was some objection to these affidavits, and consequently in about 1970, he ceased the use of the affidavit and instead started to use the "Questionnaire," a copy of which is attached to this opinion as Exhibit A (hereinafter the "questionnaire").

One of the reasons for Symm's use of the questionnaire is his belief that Article 5.08(k) of the Election Code is applicable. Symm stated that he had read in the newspaper that an opinion from some court declared Article 5.08(k) unconstitutional, but that he did not change his practices after receiving this information and that he, himself, in making residency determinations, still applies the presumption set forth in Article 5.08(k) and instructs his deputies to do the same. His testimony in this connection is confirmed by the testimony of his deputies, who state that they also, by virtue of instructions from Symm, apply the presumption decreed in Article 5.08(k).

Symm states that he has received Mark White's "Emergency Order" and has discussed this order with White. In his discussions with White, Symm questioned White's authority to issue the emergency directive. Mr. Symm states that he will continue to use the form until this court determines whether White has the authority to issue his directive, and that he will comply with the order of this court in connection with the determination of White's authority.

Mr. Symm, in his deposition taken on January 16, 1978, testified definitely, without equivocation, in response to numerous questions, that he still applies the presumption contained in Article 5.08(k). At the hearing held before this court on January 31, 1978, he forthrightly and candidly repeated this testimony.

Symm's basic procedure is as follows: A very large number of persons who apply to register to vote are personally known to Symm or his deputies as being residents of Waller County. These persons are routinely registered, upon filling out the state form, without further inquiry. A second category of persons exists who are also registered routinely and without further delay. This second category consists of persons who are not personally known to Symm or his deputies as residents of Waller County, but who are listed on the tax rolls as owning property in Waller County and whose address on the tax rolls shows an address in Waller County. A third category consists of those who do not fit within either of the above categories, and those persons are issued the questionnaire which is attached to this opinion as Exhibit A [Appendix].

Upon examining the questionnaire, Symm either registers the persons as voters, or gives them notice that a hearing has been set to hear evidence and make a determination as to their residency. Experience demonstrates that a very high percentage of the persons for whom hearings are set do not appear, and that a majority of the persons who appear for hearings are not registered.

With reference to the third category (i. e., non-property owners not known to Symm or his deputies), Mr. Symm, in making his residency determination, does not rely upon a single factor, but instead, considers the entire factual background. In this connection he considers the marital status of the applicant, the question of whether he is employed in Waller County, the question of whether he has family in the county, the question of whether he is a Waller County native, and the question of whether or not the place where he lives is a permanent address, as distinguished from a temporary residence. He states that generally students are not regarded by him as residents unless they do something to qualify as permanent residents, such as marrying and living with their spouse or obtaining a promise of a job in Waller County when they complete school. He does not regard a dormitory room as a permanent residence, and regards a permanent residence only as a place with a refrigerator, stove and furniture.

Mr. Symm has no information concerning procedures followed in other counties and no interest in those procedures.

With reference to the voter registration drive in 1976, Mr. Symm received 898 applications for voter registration which bore a permanent mailing address at Prairie View, Texas. Of these 898 applications, 79 were registered as voters on the basis of Symm's personal acquaintance and knowledge that the applicants were good faith residents of Waller County. Thirteen of these 898 were registered on the basis of examination of ad valorem tax rolls. 101 applicants were challenged and hearings set. Of the 898, 545 were requested to complete the questionnaire by certified or registered mail. 209 of the Symm mailings (which requested the addressees to fill out his questionnaire) were returned "refused" or "unclaimed." 295 of the applicants received the questionnaire but did not return it to Symm's office. 78 of the applicants completed the questionnaire and 25 of these were registered as voters without a hearing on the basis of the total contents of the questionnaire. 238 notices of hearing were sent wherein the

applicants did not appear for the hearing. Thirty applicants who were sent notices of hearing appeared, and ten were registered as good faith voters after a hearing.

In summary, of 545 potential voters who were sent the questionnaire, a total of 35 were registered as voters.

Mr. Symm believes that students and servicemen fall within the same category, and that neither are residents, as a general rule, of the place where they are stationed or attending school, and in making this determination of residency, he applies this assumption and the Article 5.08(k) presumption.

Symm testifies that a number of the questions on his questionnaire are not really very significant in enabling him to make a determination concerning residence. For example, the length of time a student has been at Prairie View, the length of time he has resided in Texas, and the question of whether or not he is employed, are of no particular significance; however, the question concerning property ownership is very significant, as is the question concerning whether the student has been promised a job in Waller County or intends to reside in Waller County "indefinitely." Symm agrees that "indefinite" is an indefinite word, but it is inferable from his testimony that he attempts to make a determination as to whether or not a student has an intent and a reasonable expectation of remaining permanently in Waller County upon completion of his studies. In this connection, Symm emphasizes that very few students continue to reside in Waller County upon graduation because of limited job opportunities and supports this view by reference to alumni statistics revealing that only about 2% of Prairie View alumni reside in Waller County.

The question concerning whether or not an applicant has an intent to remain "indefinitely" in Waller County is a question which he asks only of those who are required to fill out the questionnaire. He does not ask persons with jobs in Waller county whether they intend to remain in the county "indefinitely."

Students at Prairie View whose parents live in Waller County are treated differently from other students. These Prairie View students, the children of Waller County natives, are registered without question. In addition, married students, even if they reside in the dorms with their spouses, would be routinely registered, but not single students.

*Tests of Symm's Perception of Non-Discriminatory Use of Questionnaire*

Both the State of Texas and the Commissioners of Waller County agree that Mr. Symm sincerely perceives that his use of the questionnaire is non-discriminatory and that it is issued only to persons whom Symm does not know personally or who do not appear as property owners on the tax rolls of Waller County. This perceived assumption was accepted by both trial and appellate courts as having been established conclusively on the basis of the record developed in *Ballas*. The record in *Ballas* was obviously less comprehensive than the record developed in the case at bar.

In an effort to test the accuracy of Symm's perception, the United States, plaintiff herein, has subjected this perception to the test described below.

In answers to interrogatories served upon him pursuant to Rule 33, Fed.R.Civ.Proc., Mr. Symm attached the voter registration forms of all Waller County voters who were registered on the basis of his personal knowledge. After these interrogatories were answered, investigators for the United States interviewed every fifth person on the list of those persons who had been registered because of Symm's personal knowledge. A large percentage of these registrants did not themselves know Mr. Symm or know how Mr. Symm could have knowledge of their residence.

Thereafter Symm and his deputies analyzed the list of those voters who denied that they knew Mr. Symm, and identified each of those persons whom Symm or his deputies knew. This list appears in this record as Defendant's Exh. 10. Mr. Symm

and his deputies were not able to state, with reference to a large number of the persons listed on Defendant's Exh. 10, that they had personal knowledge concerning the residence of such individuals.

The United States of America contends that this procedure and the results thereof prove conclusively that Symm's perception as to the non-discriminatory use of his questionnaire is inaccurate.

Detailed examination of the identity of persons to whom questionnaires are sent also reveals that it appears that only Prairie View students or persons with addresses on the campus have been issued the Symm questionnaire and that others not known to Symm are not required to complete the questionnaire. This fact, among others, distinguishes the factual patterns assumed by both trial and appellate courts in *Ballas, supra.*

*Evidence Relating to County Commissioners and Analysis of Same*

There is no evidence that Waller County Commissioners have in any degree participated in Symm's determinations concerning residency of voters, or the selection of his procedures.

The parties have, however, placed before the court detailed correspondence from the County Commissioners to the Department of Justice concerning the Attorney General's objection under Section 5 of the Voting Rights Act of 1976 to a proposed redistricting. In a letter dated August 24, 1976, counsel for the County Commissioners made the following statement:

"Pursuant to the provisions of 28 C.F.R. § 51.23 (1975), the Commissioners Court of Waller County presents this request for reconsideration of the Attorney General's objection to the 1975 redistricting of Waller County. That objection appears to have been premised upon the failure of the Commissioners Court to include approximately 2,000 of the students at Prairie View A & M University ('Prairie View') in the population base for the reapportionment of Waller County. These excluded students have not quali-

fied to vote in Waller County and are probably ineligible to qualify."

This record does not reveal where the figure of "2,000 students" originated. The testimony of C. A. Thomas, the Registrar of Prairie View, is that as of October 21, 1976, there were 2,918 dormitory students residing at Prairie View. The testimony of Mr. Hicks is that approximately 1,000 Prairie View students attempted to register and vote during the voter registration drive in 1976. The origin of the "2,000 students" figure is obscure.

In view of the undisputed fact that for many years Mr. Symm has applied the presumption set forth in Article 5.08(k), it is impossible to determine from this record, or from the facts as they must exist at the present time, how many duly qualified registered voters do exist at Prairie View University. All that can be said with certainty is that there are probably more than 38 and less than 2,918. Until Mr. Symm and the Commissioners have gained some experience in registering students applying proper procedures, it is impossible to determine how many of the dormitory students at Prairie View are properly registered voters in Waller County.

The case of *Eristus Sams v. Commissioners of Waller County,* Civil Action No. 75–H–965, is a pending case challenging the districting methods used in Waller County. Questions relating to the districting or redistricting of Waller County must be resolved in that case.

AUTHORITIES

*Authorities Relating to 26th Amendment Allegations*

■ On June 22, 1970, Congress passed the Voting Rights Act Amendments of 1970, containing in Title III, the following provisions:

TITLE III—REDUCING VOTING AGE TO EIGHTEEN IN FEDERAL, STATE AND LOCAL ELECTIONS

Declaration and Findings

Sec. 301 (a) The Congress finds and declares that the imposition and applica-

tion of the requirement that a citizen be twenty-one years of age as a precondition to voting in any primary or in any election—

(1) denies and abridges the inherent constitutional rights of citizens eighteen years of age but not yet twenty-one years of age to vote—a particularly unfair treatment of such citizens in view of the national defense responsibilities imposed upon such citizens;

(2) has the effect of denying to citizens eighteen years of age but not yet twenty-one years of age the due process and equal protection of the laws that are guaranteed to them under the Fourteenth Amendment of the Constitution; and

(3) does not bear a reasonable relationship to any compelling State interest.

(b) In order to secure the constitutional rights set forth in subsection (a), the Congress declares that it is necessary to prohibit the denial of the right to vote to citizens of the United States eighteen years of age or over.

## Prohibition

Sec. 302 Except as required by the Constitution, no citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any primary or in any election shall be denied the right to vote in any such primary or election on account of age if such citizen is eighteen years of age or older.

## Enforcement

Sec. 303 (a) (1) In the exercise of the powers of Congress under the necessary and proper clause of section 8, article 1 of the Constitution, and section 5 of the Fourteenth Amendment of the Constitution, the Attorney General is authorized and directed to institute in the names of the United States such actions against States or political subdivisions, including actions for injunctive relief, as he may determine to be necessary to implement the purpose of this title.

(2) The district courts of the United States shall have jurisdictions instituted pursuant to this title, and shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28, of the United States Code, and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing and determination thereof, and to cause the case to be in every way expedited.

(b) Whoever shall deny or attempt to deny any person of any right secured by this title shall be fined not more than $5,000 or imprisoned not more than five years, or both.

## Definition

Sec. 304 As used in this title, the term "State" includes the District of Columbia.

The statute quoted above was limited to federal elections by *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), but almost immediately Congress proposed and three-fourths of the states adopted the 26th Amendment which provides that the right of citizens who are over 18 to vote shall not be "denied or abridged" by any state "on account of age."

Senate Report No. 26, 92nd Cong., 1st Sess. (1971), with reference to the 26th Amendment noted that:

". . . forcing young voters to undertake special burdens—obtaining absentee ballots, or traveling to one centralized location in each city, for example—in order to exercise their right to vote might well serve to dissuade them from participating in the election. This result and the election procedures that create it, are at least inconsistent with the purpose of the Voting Rights Act, which sought to encourage greater political participation on the part of the young; such segregation might even amount to a denial of their 14th Amendment right to equal protection of the laws in the exercise of the franchise."

In 1976, Congress amended the language of Title III of the Voting Rights Act in § 1973bb to specifically set out that this portion of the Act was "to implement" the 26th Amendment.

Litigation was necessary to enforce the promises of Title III of the Voting Rights Act Amendment of 1970, and the 26th Amendment. One such case was *Whatley. Whatley* does not stand alone, but is merely one of a number of cases reaching virtually the identical conclusion and applying the same philosophy.

The first of this series of cases is *Bright v. Baesler,* 336 F.Supp. 527 (E.D.Ky.1971). Like *Whatley, Bright v. Baesler* was a case in which officials in Lexington, Kentucky sought to enforce a presumption that students were domiciliaries of their parents' homes. Plaintiffs contended that the official practices were violative of the 14th and 26th Amendments, as well as of 42 U.S.C. § 1971, et seq. As in the case at bar, the registrar in *Bright* had required students to complete and answer a series of questions designed to overcome a presumption that they were domiciliaries of their parents' homes.

The court enjoined the defendants from imposing additional or special criteria for proof of domicile upon University students; required the defendant to ask each applicant the same questions regardless of occupation and required that the questions asked reasonably relate to proof of domicile. The court at 336 F.Supp. at 533 said:

". . . Because voting rights involve the First Amendment freedom of association, the State may not impose restrictions upon that right unless there is a compelling state interest in the imposed restriction or classification. *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). It would seem, therefore, that the extra burden of proof imposed upon students in regard to proof of their domicil may only be held constitutional if a compelling state interest is thereby served.

"There is no dispute in this case that Kentucky has the right to require every applicant for voter registration to be a domiciliary of the precinct in which he offers to vote. But may the State require, and is there any compelling reason why it should require, students to go to greater lengths to prove domicil than other citizens. This court thinks not.

. . . . .

"There is no reason to assume, and the defendants have offered none that would satisfy the compelling interest test, that a person claiming to have fulfilled the domiciliary requirement is not to be believed if he is a student . . . Simply put there are no salient reasons to treat registering students differently from other people merely because they are students.

. . . . .

"Notwithstanding the fact that there may be a significant number of students who do intend to return to their former homes, there is an equally significant number of students who do not intend to return to their former homes, and the presumption against university domicil unfairly discriminates against them.

. . . . .

"The court cannot conceive of any reason why it should not be presumed that student applicants for voter registration, like any other applicant, have made their application to register in good faith. Admittedly a student may not be able to state with certitude that he intends to permanently live in the university community, but such a declaration is not necessary to establish domicil.

. . . . .

"This is not to say that the defendants may not require each applicant to prove domicil. The defendants may ask each applicant a series of questions directed at proving domicil, but each applicant should be asked the same questions, and the questions should reasonably relate to proof of domicil."

In *Shivelhood v. Davis,* 336 F.Supp. 1111 (D.Vt.1971) the registrar was held to be applying an incorrect standard by requiring students to produce more persuasive evidence of their domicile than did other voter applicants. The registrar required of each registrant an intent to remain in Middlebury permanently, thus precluding most students, who were unable to state with

certainty where they would live upon completing their studies. The court said (336 F.Supp. at 1115):

"The fact that a student lives in a dormitory, is unmarried, is supported financially by his parents who live elsewhere, would be considered a minor in the state in which his parents live and occasionally visits his parents, even if all these factors occur together, is not alone sufficient to preclude domicile in the town in which the student attends school, although these factors may be considered together with other relevant evidence. Furthermore, although we do not imply that the Board has considered them to be relevant, we think it important to note that such factors as the lack of a Vermont driver's license or car registration are irrelevant unless the individual has a license or registration in another state.

.    .    .    .    .

"Thus, the Board of Civil Authority must not require students to fill out a supplemental questionnaire involving questions concerning their domicile unless all applicants are required to complete the same questionnaire. Moreover, the Board of Civil Authority must use its best efforts to insure that any questionnaire is equally relevant to all applicants and not designed only to apply to student applicants."

*Ownby v. Dies*, 337 F.Supp. 38 (E.D.Tex. 1971) involved Article 5.08(m) of the Texas Election Code, which provided for voting residency of persons under 21 years of age on a different basis than that applied to persons 21 years of age or over. *Ownby, supra*, is in effect an agreed judgment in which the State of Texas agreed with the plaintiffs that Article 5.08(m) violated the plaintiff's rights under the 14th and 26th Amendments.

The litigation to make genuine the guarantees of the 26th Amendment was not limited to the federal courts. The Supreme Court of California decided *Jolicoeur v. Mihaly*, 5 Cal.3d 565, 96 Cal.Rptr. 697, 488 P.2d 1 (Aug. 27, 1971) decreeing that newly enfranchised young people in California, residing apart from their parents, should be treated like other voters for the purpose of acquiring voting residence and should not be presumed to reside with their parents. Voting registrars of five major counties in California declined to register students on the basis of a California Attorney General's opinion concluding that for voting purposes the residence of an unmarried minor would normally be his parents' home. The plaintiffs sought from the court a decree directing the various registrars to register them in accordance with the same procedures and qualifications followed with respect to adult registrants. The Supreme Court of California granted relief, reasoning that to compel students to travel to the homes of their parents, or to compel them to vote absentee burdened their right to vote, and thus abridged that right in contravention of the 26th Amendment.

The California Supreme Court enjoined the defendants from treating students in a manner different from other voter registrants primarily on the basis of a detailed and comprehensive review of the legislative history of Title III of the Voting Rights Act of 1970 and the 26th Amendment. The California Supreme Court said (96 Cal.Rptr. at 703, 488 P.2d at 7):

"America's youth entreated, pleaded for, demanded a voice in the governance of this nation. On campuses by the hundreds, at Lincoln's Monument by the hundreds of thousands, they voiced their frustration at their electoral impotence and their love of a country which they believed to be abandoning its ideals. Many more worked quietly and effectively within a system that gave them scant recognition. And in the land of Vietnam they lie as proof that death accords youth no protected status. Their struggle for recognition divided a nation against itself. Congress and more than three-fourths of the states have now determined in their wisdom that youth 'shall have a new birth of freedom'—the franchise. Rights won at the cost of so much individual and societal suffering may not and shall not be curtailed on the basis of

hoary fictions that these men and women are children tied to residential apron strings. Respondents' refusal to treat petitioners as adults for voting purposes violated the letter and spirit of the Twenty-Sixth Amendment."

The identical result was reached by the Supreme Court of New Jersey in *Worden v. Mercer County Board of Elections*, 61 N.J. 325, 294 A.2d 233 (1972). That court distinguished any earlier, inconsistent decisions by pointing out that earlier decisions were made "in relatively immobile areas when it was generally assumed that the college student would lead a semi-cloistered life with little or no interest in non-college community affairs and with the intent of returning on graduation to his parents' home and way of living. Such assumption, of course, has no current validity."

Well reasoned opinions by courts in Pennsylvania, Mississippi and Michigan have reached identical conclusions. See *Sloane v. Smith*, 351 F.Supp. 1299 (M.D.Pa.1972); *Latham v. Chandler*, 406 F.Supp. 754 (N.D. Miss.1976); *Frazier v. Callicutt*, 383 F.Supp. 15 (N.D.Miss.1974); *Wilkins v. Bentley*, 385 Mich. 670, 189 N.W.2d 423 (1971).

*Ballas* must be construed in the light of the foregoing authorities and also in the light of the very careful, limiting language of Judge Roney in *Ballas. Ballas* merely holds that on the record in that case, in which there was no proof of either racial discrimination or discrimination based on age, the use of the Symm form was constitutionally permissible so long as it did not abridge 26th Amendment rights to provide, by itself, the basis for a refusal of registration. Judge Roney carefully pointed out in *Ballas* that:

"  .   .   .   The alleged harm is not in the denial of voter registration but in being required to answer the questionnaire.  .   .   .

the cumulative effect of the answers is to support or fail to support the applicant's assertion of residency. It appears to be nothing more  .   .   .   There is no proof that the questionnaire was used as a device to prevent legal residents from voting."

In the case at bar, plaintiff does not challenge the Symm questionnaire *per se*, but alleges that in fact Mr. Symm has improperly denied voter registration to numerous students at Prairie View and that the Symm questionnaire was an integral step in the procedure involved in such denial. In addition, there is here both allegation and proof that the questionnaire was used as a part of a pattern of conduct in which Symm denied Prairie View students the right to vote or abridged such right by the application of a presumption declared unconstitutional in *Whatley* and in the other cases discussed above.

### Texas Authorities

The evidence in this case establishes that Symm is the only registrar in the State of Texas who uses the questionnaire of the type here in controversy. Seventy counties in the state have institutions of higher learning, and Symm is the only county registrar who employs a questionnaire of the type here under attack. Symm contends this fact is not only immaterial, but that it establishes that he is the only registrar in the state who complies with the requirements of law and who conscientiously makes a factual determination as to the residence of students.

Symm's position is inconsistent both with the 26th Amendment cases discussed above, and also with the relevant Texas cases.

The only Supreme Court of Texas case relating to residency of students is *Mills v. Bartlett*, 377 S.W.2d 636 (Tex.Sup.Ct.1964). While the facts of *Mills, supra*, are not similar to any of the facts relating to any Prairie View student, the language of the Supreme Court is significant (377 S.W.2d at 637):

"  .   .   .   Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined. There is no specific length of time for the bodily presence to continue  .   .   ."

It is apparent from *Mills v. Bartlett* that there is no requirement that a student, in order to establish that he is a resident of the place where he wishes to vote, establish that he intends to remain there permanently or for any particular period of time.

A review of the applicable opinions of the Texas courts of civil appeals reveals that the courts have not applied the same standards and the same reasoning as has Mr. Symm in dealing with students and other persons whose life style is similar to that of students. For example, in *Cavallin v. Ivey*, 359 S.W.2d 910 (Tex.Civ.App.—El Paso 1962), the court dealt with a problem created by two Mexican-American citizens of the United States whose wives and families lived in Mexico. The Mexican-American citizens visited their families in Mexico on Sundays, and worked during the week in Brewster County. Although Article 5.08(f) of the Texas Election Code provides that a married man, not permanently separated from his wife, shall be deemed to have a residence where his family lives, the Court of Civil Appeals held that a literal application of that language would disenfranchise these Mexican-American citizens and thus held them qualified to vote in Brewster County even though their families resided in Mexico, and even though the men visited Mexico each weekend and simply worked in Brewster County.

In *McBeth v. Streib*, 96 S.W.2d 992 (Tex. Civ.App.—San Antonio 1936) the voters in question were members of the Civilian Conservation Corps, living in a CCC camp. In finding the young men living in the CCC camp were qualified voters in the county in which they were physically present, the San Antonio Court of Civil Appeals, long before *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675, said (96 S.W.2d at 995):

"The presumption, of course, obtains here, as generally in this state, that every man has the right and privilege of fixing his residence according to his own desires. This applies to single men as well as married men, though it is a matter of common knowledge that single men do change their places of residence more frequently than married men. That fact, however, does not change or take away their definite legal rights, if, as, and when they comply with the law and acquire same under a change of residence or otherwise. It is equally true that a man is presumed, ordinarily, to 'reside' where he 'lives,' and this is true for voting privileges, provided he has lived there for the length of time prescribed by law; and certainly this is true if he declared such to be his intention and he proceeds to perform the acts and duties incident to legal residence, such as securing his poll tax receipt or exemption certificate, and for the very purpose of so doing, and then actually votes, at the local or precinct elections of his residence. *McCharen v. Mead*, Tex.Civ.App., 275 S.W. 117; *Hogg v. Waddell*, Tex.Civ.App., 42 S.W.2d 488."

In *Clark v. Stubbs*, 131 S.W.2d 663 (Tex. Civ.App.—Austin 1939) one of the challenged votes was that of a college student who had voted in the county of her parents' residence. In upholding this vote, the court said: ". . . that a student in college *may* retain his or her residence in the county where they resided before they became a student." The obvious inference is that if a student *may* retain his or her residence in the county where he resided before he became a student, he may also lose it and become a resident of the place where he is attending college. This precise situation, where a person loses his previous residence in the county of his parents' residence, is illustrated by *Spraggins v. Smith*, 214 S.W.2d 815 (Tex.Civ.App.—Amarillo 1948) where a young woman had lived with her parents before going to Washington to take a job which arguably would not be permanent. The court upheld a trial court determination that the young woman, who had gone to Washington for an arguably temporary job, had lost her residence in the county where her parents resided and her vote was disallowed.

Another case where a student lost his residence in the county where his parents resided, and where he had resided before becoming a student, is *Harwell v. Morris*,

143 S.W.2d 809 (Tex.Civ.App.—Amarillo 1940). This was an election contest involving Oldham County. The challenged voter had left Oldham County and gone to Amarillo where he became a student with a part time job. The trial court, with appellate court concurrence, held that the student had lost his residence in the county where he had resided before becoming a student and had become a resident of Amarillo where he was a student with a part time job.

It is clearly inferable from Mr. Symm's detailed testimony on deposition and at the trial that he will register a dormitory student at Prairie View, only if the dormitory student is a Waller County native whose family lives in Waller County, or if the student has been promised a job in Waller County after he completes school. No Texas case supporting this procedure has been discovered. Even without reference to the unconstitutionality of Texas Election Code Article 5.08(k), Symm's procedures and criteria with reference to dormitory students appears inconsistent with the relevant Texas cases.

*Authorities Relating to Pendent or Ancillary Jurisdiction*

Both the State of Texas and Symm contend that this court has pendent jurisdiction to decide the controversy between them relating to whether or not the Secretary of State, pursuant to the powers granted to him by the Texas Election Code, has the power to prohibit Symm from using the Symm questionnaire. The United States, for reasons not apparent to the undersigned, contests this pendent jurisdiction.

Rule 13(g), Fed.R.Civ.Proc., in its pertinent parts, states that:

"A pleading may state as a cross claim any claim by one party against a co-party arising out of the same transaction or occurrence that is the subject matter either of the original action, or of a counterclaim therein . . ."

The term "transaction" as used in Rule 13(g) has a "flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon the logical relationship . . ." *Moore v. New York Cotton Exchange,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926).

■ Applying the language of *Moore* and the test as set forth in *Revere Copper & Brass, Inc. v. Aetna Casualty Insurance Company,* 426 F.2d 709 (5th Cir. 1970), it would appear that the subject matter of the cross-claims between White, Hill and Symm do in fact arise out of the same "transaction" as does the United States' complaint. Accordingly it would appear that this court does have pendent jurisdiction over the controversy between White, Hill and Symm. See *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. It is apparent that the state and federal claims both derive from a "common nucleus of operative fact" and that all of the claims asserted by all of the parties are such that the parties would ordinarily be expected to try them in one judicial proceeding. See 383 U.S. 715 at 725, 86 S.Ct. 1130, 16 L.Ed.2d 218.

*Authority of the Secretary of State to Prohibit Use of the Symm Form*

■ The Texas Election Code, on its bare language, supports the claim of the Secretary of State and the Attorney General that the Secretary of State has power to prohibit use of the Symm form, particularly where, as here, there is substantial evidence that the Symm form has been used as an integral part of a pattern of conduct which abridged the voting rights of a segment of the citizenry. When the statutory language is considered in the light of the history set forth on page 1246 above in this Memorandum Opinion, the conclusion that the Secretary of State did have the authority to issue his Emergency Order No. 004.-30.05.313 is confirmed.

The Texas Election Code, after amendment in 1975 in apparent response to the trial court's opinion in *Ballas* reads:

"Article 1.03. Secretary of State as Chief Election Officer.

"Subdivision 1. The Secretary of State shall be the Chief Election Officer of this state, and it shall be his responsibility to obtain and maintain uniformity in the application, operation and interpretation of the election laws. In carrying out this responsibility, he shall cause to be prepared and distributed to each county judge, county tax assessor-collector, . . . detailed and comprehensive written directives and instructions relating to and based upon the election laws as they apply to elections . . . . Such directives and instructions shall include sample forms of ballots, papers, documents, records and other materials and supplies required by such election laws.

"Article 5.02. Qualification and Requirements for Voting.

. . . . .

(b) All citizens of this state who are otherwise qualified by law to vote at any election of this state or any district, county, municipality, or other political subdivision, shall be entitled and allowed to vote at all such elections. The Secretary of State shall, by directive, implement the policies stated herein throughout the elective procedures and policies by or under authority of this state. Enforcement of any directive of the Secretary of State pursuant to this section may be by injunction obtained by the Attorney General."

*Bullock v. Calvert*, 480 S.W.2d 367 (Sup. Ct.Tex.1972) is not factually analogous; however, the language of the Texas Supreme Court supports the Secretary of State's power to issue the Emergency Order. Justice Reavley there said:

". . . He (i. e., the Secretary of State) is designated 'Chief Election Officer' for the purpose of obtaining uniformity in the operation of the election laws. He is to assist and advise all election officers of the state. It is surely his office to communicate and explain the law to the end that all of the provisions of this Election Code will be followed throughout the state at every election and in every polling place. But no com-mission is given for him to conduct and pay for party primaries."

*Recent cases of the Supreme Court of the United States Relating to State Restrictions on the Right to Vote*

*Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) involved a constitutional provision prohibiting any member of the armed forces who moved his home to Texas during the course of his military service from voting in an election in Texas so long as he was a member of the armed services. The State of Texas in *Carrington* made arguments very similar to those asserted by Mr. Symm herein. The state argued it could reasonably be assumed that servicemen were mere transients who would not remain within the state for an extended period.

In rejecting the state's arguments, the Supreme Court said:

". . . 'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible. 'The exercise of rights so vital to the maintenance of democratic institutions,' *Schneider v. State*, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 cannot constitutionally be obliterated because of a fear of the political views of a particular group of bona fide residents. Yet, that is what Texas claims to have done here . . ."

The Supreme Court in *Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) held it unconstitutional for the State of New York to restrict the right to vote in school elections to owners of real property or parents of children attending schools, relying upon earlier language of *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964) wherein it was stated that:

"Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."

While pointing out that the plaintiff, a bachelor and non-property owner who lived with his parents, nevertheless was a member of the community and that the entire community had a crucial interest in the quality and structure of public education, Justice Warren said (395 U.S. at 627, 89 S.Ct. at 1890):

" . . . when we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable. See Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 670, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 (1966). The presumption of constitutionality and the approval given 'rational' classifications in other types of enactments are based on an assumption that the institutions of state government are structured so as to represent fairly all the people. However, when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality.".

On the same day that it decided Kramer, supra, the Supreme Court held in Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) that the City of Houma could not constitutionally restrict the right of all properly qualified voters to vote in elections called to approve the issuance of revenue bonds by a municipal utility.

In Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), the Supreme Court held that the State of Maryland could not constitutionally deprive residents of a federal reservation or enclave from voting in the State of Maryland because such deprivation constituted a violation of the Equal Protection Clause. Justice Marshall said (398 U.S. at 423, 90 S.Ct. at 1755):

" . . . there can be no doubt at this date that 'once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.' Harper v. Virginia Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966); see Williams v. Rhodes, 393 U.S. 23, 29, 89 S.Ct. 5, 9, 21 L.Ed.2d 24 (1968). Moreover, the right to vote, as the citizen's link to his laws and government, is protective of all fundamental rights and privileges. See Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886); Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 534, 11 L.Ed.2d 481 (1964). And before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny."

In Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) the Supreme Court held unconstitutional Tennessee's one-year durational residency requirement because such requirements penalize persons who travel from one place to another to establish a new residence during the qualifying period, and thus deny a portion of the citizenry their rights under the Equal Protection Clause of the 14th Amendment.

Mr. Symm's practices here are inconsistent with the philosophy and trend of the foregoing cases, and directly in contravention of the holdings and language in Carrington v. Rash, supra, and Evans v. Cornman, supra.

## CONCLUSION

Mr. Symm's forthright admission that he has, for many years, applied the unconstitutional presumption of Whatley establishes that the plaintiff is entitled to relief against Symm. Since Symm has, for a number of years (in the face of advice from the Secretary of State) continued to apply to the students of Prairie View an erroneous rule of law in making his factual determinations of residency, the court believes that a detailed injunction is appropriate and counsel are directed to prepare, and if possible agree upon, the form of an appropriate judgment.

Plaintiff has not on this record demonstrated that it is entitled to any relief against the County Commissioners of Waller County. While it could be inferred that the Court Commissioners of Waller County have taken official action on the incorrect assumption that virtually none of the students at Prairie View are properly classified as residents of Waller County, this fact is not established with definiteness and precision. In addition, this is not a redistricting case. Plaintiff has not sought redistricting. The question of the proper districting of Waller County is the subject matter of another suit, and thus the court at this time will deny relief against the County Commissioners of Waller County, except that the United States is given leave to reopen the factual record within thirty (30) days, to introduce additional evidence and present

additional authorities relating to possible relief against the Waller County Commissioners in this case, if the United States believes that such relief is appropriate.

It appears from this record that the State of Texas, the Secretary of State of the State of Texas, and the Attorney General of Texas have taken all practicable steps within their command to encourage Mr. Symm to apply a correct rule of law and to protect the 14th, 15th and 26th Amendment rights of Prairie View dormitory students; therefore, no relief against the State of Texas, the Secretary of State of the State of Texas, or the Attorney General of Texas would appear appropriate.

The Clerk will forward true copies hereof to counsel of record who will draft and submit judgment accordingly.

## APPENDIX

## EXHIBIT A

### OFFICE OF ASSESSOR–COLLECTOR OF TAXES
Waller County
Hempstead, Texas

#### Questionnaire Pertaining To Residence

The undersigned, at the request of the Registrar of Waller County, answers the following questions in support of the application of the undersigned for a voter registration certificate or for appointment as a Deputy Registrary, as the case may be:

Please print or type your name and address: _____

Are you a college student? _____. If so, where do you attend school? _____. How long have you been a student at such school? _____. Where do you live while in college? _____. How long have you lived in Texas? _____. In Waller County? _____. Do you intend to reside in Waller County indefinitely? _____. How long have you considered yourself to be a bona fide resident of Waller County? _____. What do you plan to do when you finish your college education?

Do you have a job or position in Waller County? _____. Own any home or other property in Waller County? _____. Have an automobile registered in Waller County? _____. Have a telephone listing in Waller County? _____. Belong to a Church, Club or some Waller County Organization other than college related? _____. If so, please name them: _____

Where do you live when the college is not in session? _____. What address is listed as your home address with the college? _____. Give any other information which might be helpful:

The undersigned understands that the giving of false information to procure the registration of a voter is a felony.

Executed this _____ day of _____, 197__.

Signature _____

Must be returned within five days of delivery.